UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Billy Boy Real Estate LLC, et al., : <br> : <br> Plaintiffs, : <br> : No. 2:24-CV-05559-MAK <br> v. : <br> : <br> Upper Merion Township, et. al., : CIVIL ACTION- LAW <br> : JURY TRIAL DEMANDED <br> Defendants. : <br> : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS
FOR DEFENDANTS, UPPER MERION TOWNSHIP, BOARD OF SUPERVISORS,
TINA GARZILLO, WILLIAM JENAWAY, GREG WAKS, GREG PHILIPS,
CAROLE KENNEY, AND ANTHONY HAMADAY'S
MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56(c)**

Defendants, Upper Merion Township, Board of Supervisors, Tina Garzillo, William Jenaway, Greg Waks, Greg Philips, Carole Kenney, and Anthony Hamaday, by and through their undersigned counsel, Andrew M. Rongaus, Esquire and Theodore T. Speedy, Jr., Esquire, of Siana Law, LLP, respectfully submit the following Statement of Undisputed Material Facts for Defendants' Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c).

**A.    PARTIES INVOLVED**

1. Plaintiff Billy Boy Real Estate, LLC, is a limited liability company organized pursuant to the laws of the Commonwealth of Pennsylvania, as is Plaintiff Billy Boy Construction, LLC (hereafter collectively referred to as "Billy Boy"). Billy Boy is a certified Minority Business Enterprise (MBE). Its principal place of business is located at 216 Allendale Road, King of Prussia, Pennsylvania 19406. (*Stipulation of Undisputed Facts, ECF #15*, marked as "Exhibit 1", at ¶3).

2.  Plaintiff Eddie Hendrick is an African American male citizen of the United States and a resident of this judicial district. He is the sole shareholder and President of Billy Boy Real Estate, LLC and Billy Boy Contracting, LLC. (ECF #15, ¶4).

3.  Eddie Hendrick is the owner of Billy Boy Contracting, which he started in 2002. (*Testimony of Eddie Hendrick taken March 26, 2025*, marked as "Exhibit 2" at p. 10:11-19).

4.  Billy Boy Contracting does contract work, hauling, excavation and utility services for the city of Philadelphia and the airport. (Hendrick Dep. at p. 12:6-10).

5.  Defendant Upper Merion Township (the "Township") is a second-class township in Montgomery County, Pennsylvania. Defendant Upper Merion Township Board of Supervisors (the "Board") is the governing body of Upper Merion Township and is comprised of five (5) elected members. At all times relevant to this case, the members of the Board were Tina Garzillo, Chairperson, William Jenaway, Ph.D., Vice Chairperson, Greg Waks, Greg Philips, and (ECF #15, ¶5).

6.  The Township is governed by an at-large group of five Supervisors (*Testimony of Tina Garzillo taken March 25, 2025*, marked as "Exhibit 3", at p. 9:14-17).

7.  For the Board of Supervisors to take action, they must vote as a whole in a public meeting. (Garzillo Dep. at p. 88:21-89:1).

8.  Individual Board Members have no authority to act on behalf of the Board. (Garzillo Dep. at p. 89:2-4).

9.  The Board of Supervisors is permitted to discuss real estate matters prior to a decision in executive session. (Garzillo Dep. at p. 92:10-21).

10. The first step in the land acquisition process is determining value which requires performance of an appraisal. (Garzillo Dep. at p. 46:9-12).

11. When acquiring property, townships are bound to the amount indicated in the appraisal regardless of what method the Township acquired, either by agreement of sale or condemnation. (Garzillo Dep. at p. 35:22-36: 3).

12. The 2022 Census Report indicates that the demographic makeup of the Township is: 68.3% White; 7.5% is Black; and 17.8% Asian. (*Township Census Demographic Sheet*, marked as "Exhibit 4"; Garzillo Dep. at p. 96; 9:13; p. 97: 3-5; p. 97:13).

13. The report also lists two hundred and eighty-eight (288) minority-owned employers within the Township. (Garzillo Dep. at p. 98:2-7).

14. Tina Garzillo is the Chair of the Board of Supervisors. She was first appointed to that position in 2018. (Garzillo Dep. at p. 8:7-18).

15. Prior to being appointed to the Board of Supervisors, Garzillo was on the Parks and Recreation Advisory Board since approximately 2010. (Garzillo Dep. at p. 8:15-20).

16. Anthony Hamaday is employed as the Township Manager of Upper Merion Township; he has been in the position for five years. (*Testimony of Anthony Hamaday-Individual taken March 24, 2025*, marked as "Exhibit 5", at p. 8:17-24).

17. Hamaday reports directly to the Board of Supervisors and all department heads report directly to him. (Hamaday Dep. at p. 11:14-24).

18. This was the first condemnation of property that Hamaday was involved with while working with Upper Merion Township. (Hamaday Dep. at p. 43:14-21).

19. Anthony Hamaday was the Township's agent in discussions with Louis A. Damiani on purchasing 216 Allendale Road. (Garzillo Dep. p. 47:17-21).

B.  **THE SUBJECT PROPERTY**

20. 216 Allendale Road (the "Property"), King of Prussia, PA 19406 is a 1.13-acre parcel located in Upper Merion Township, owned by Louis A. Damiani. (*Amended Complaint*, *ECF #3*, marked as "Exhibit 6", at ¶9; ECF #15, ¶6).

21. The Property is a heavy industrial, non-conforming, pre-existing use, adjacent to the Pennsylvania Turnpike, utilized by construction contractors for the storage of large trucks and contains a large garage facility for the repair of large industrial equipment. (ECF #3, ¶17).

22. The Property was used by White-owned businesses, operated from the early 1950s until January 2023. (ECF #3, ¶17).

23. The parcels of real estate owned by the Township adjacent to the Property are separated by a creek and wooded area. (ECF#3, ¶20; ECF #15, ¶9).

24. The Township has owned Walker Park for close to 70 years. (Hamaday Dep. at p. 20:10-14)

25. The Township purchased 270 Allendale Road and 280 Allendale Road in 1994. These are referred to as the Mullen Tract. (*Testimony of Anthony Hamaday as Township Designee take*n March 24, 2025, marked as "Exhibit 7", at p. 9: 5-15).

26. The Township purchased these properties as being adjacent to Township owned property and linking a trail system. (Designee Dep. at p.9:18-21).

C.  **TOWNSHIP'S LONGSTANDING INTEREST IN THE SUBJECT PROPERTY**

27. Acquisition of the Property has been under discussion by the Township for a long time. (Garzillo Dep. at p. 37:14-17).

28. "The Township has always wanted [the Property] because it is adjacent to both the Township's Mullen Track and Walker Park." (Hamaday Dep. at p.15:17-20).

29. The purpose of obtaining the property was to acquire more open space for the Township. (Hamaday Dep. at p. 58:15-18).

30. The Township had considered using this space for a dog park, expanding the land adjacent to the Crow Creek Trail, or for extra land next to the athletic fields. (Garzillo Dep. at p. 41:16- 42:16).

31. This use could be active open space(s) such as fields, or passive woods and grassland next to the Mullen Track and Walker Park. (Hamaday Dep. at p. 59:5-10).

32. The plan to acquire the Property and create general improvements to the adjoining properties had been contemplated for many years. (Garzillo Dep. at p. 67:6-8).

33. This included the possibly of moving baseball fields to avoid flooding. (Garzillo Dep. at p. 69:7-9).

34. Acquiring the property is reflected in the Township's Open Space Plan adopted between 2012 and 2015. (Hamaday Dep. at p. 16:1-8).

35. Ron Wagenman was the Township Manager from 1983 until 2012. (Hamaday Dep. at p. 10:18-22).

36. Damiani was aware, through Ron Wagenman, that the Township was interested in buying the Property. (Hamaday Dep. at p. 25:14-23).

37. The Township had prepared a draft agreement of sale in 2008 which was rejected due to the low sale price. (Hamaday Dep. at p. 51:8-24; *2008 Draft Agreement of Sale,* marked as "Exhibit 8").

38. The Township performed an appraisal of the property in 2009. (Hamaday Dep. at p. 42:12-15; *2009 Appraisal Report,* marked as "Exhibit 9"*; 12/14/2009 Letter Regarding Phase I Study,* marked as "Exhibit 10").

39. A Township Zoning Workshop meeting was held on August 6, 2020. (Hamaday Dep. at p. 45:10-19; *08/06/2020 Township Zoning Workshop Meeting Minutes,* marked as "Exhibit 11").

40. At this workshop, Catalyst, a marketing company, had secured an agreement of sale for the Property with Damiani, and sought permission to place digital billboards along the Turnpike on the Property. (Hamaday Dep. at p. 46:1-24).

41. The Township understood this agreement with Catalyst indicated that Damiani was interested in selling the property, although this deal did fall through. (Garzillo Dep. p. 48: 21-49:15).

42. Hamaday first met Damiani in August of 2021 after the real estate appraiser contacted him regarding the appraisal of the Property. (Hamaday Dep. at p.14:1-7).

43. Mark Abissi with Indian Valley Appraisals completed an appraisal in August of 2021 because the Township was interested in purchasing the property. (Hamaday Dep. at p. 14:10-19; *2021 Appraisal Report,* marked as "Exhibit 12").

44. The appraised value of the Property was $940,000.00 -$970,000.00. (Hamaday Dep. at p.15:5).

45. Once the August 2021 appraisal was done, the Board of Supervisors included the prospective purchase of the Property in the 2022 budget and bond issue. (Hamaday Dep. at p. 23:22-24:22).

46. The bond issue in 2022 was for $10 million. (Hamaday Dep. at p. 76:4).

47. $3.7 million was earmarked for open space. (Hamaday Dep. at p. 76:11).

48. Hamaday first visited the Property in August of 2022 to meet with Damiani. (Hamaday Dep. at p. 13: 13-22).

49. In August of 2022 Hamaday contacted Damiani to ask if he was willing to sell the Property. (Hamaday Dep. at p. 28:17-21).

50. Damiani told Hamaday that he already sold the Property for $2 million. (Hamaday Dep. at p. 29:16-19).

51. The fact that the Property would have been sold for $2 million was important as that would have provided a new fair market value of the Property. (Hamaday Dep. at p.78:21-79:4; 80:1-3).

52. Damiani said he had sold the Property to Eddie Hendrick and Hamaday asked if Damiani could have Hendrick contact him. (Hamaday Dep. at p.30:1-5).

53. Hendrick called Hamaday and said that the Property was under agreement; Hamaday told Hendrick that if he did purchase the Property, to please call the Township as they were interested in buying it. (Hamaday Dep. at p.31:5-17).

54. When notified by Damiani that Plaintiffs were going to purchase the Property he conducted an internet search and identified Billy Boy Trucking as a minority business. (Hamaday Dep. at p.72:9-16).

55. Garzillo was aware of the name Eddie Hendrick and Billy Boy regarding the reported sale of the Property. (Garzillo Dep. at p. 53:7-18).

56. Garzillo became familiar with Plaintiffs around the time that Hamaday reported that Damiani told them he was selling the property. (Garzillo Dep. at p. 52:2-7).

57. Hamaday made it known to Garzillo there was an Agreement of Sale between Hendrick and Damiani. (Garzillo Dep. at p. 104:12-15).

58. It was also expressed that this was through an unsigned informal document. (Garzillo Dep.at p. 104:20-23).

59. However, it was unclear to the Township that this sale occurred because no Deed of Transfer had been recorded. (Garzillo Dep. at p. 52:21-23.)

60. Garzillo had no knowledge of the business being performed at the property as it is not visible from the street. (Garzillo Dep. at p. 53:24-54:15).

61. Garzillo was aware that Billy Boy was a minority-owned business doing work in Philadelphia. (Garzillo Dep. at p. 55:11-17).

62. She was not aware of Hendrick's race. (Garzillo Dep. p. 56:1).

63. Garzillo assumed that Hendrick was white. (Garzillo Dep. at p. 57:11-13).

64. Garzillo said that Hamaday told the Board that Billy Boy Trucking was a minority-owned business. (Garzillo Dep. at p. 92:22- 93:2).

**D.    PLAINTIFFS' INTEREST IN THE SUBJECT PROPERTY**

65. In 2022, Hendrick was operating his company out of 549 Foundry Road in East Norriton. (Hendrick Dep. at p. 13:20-21 and p.14:5-6).

66. Hendrick was told to speak to Damiani, the owner of the Property, about a possible new location for his business. (Hendrick Dep. at p. 14:15-20)

67. Initially they had a handshake agreement, and Hendrick began to work at the Property and get it into a position suitable for his business. (Hendrick Dep. at p. 15:13-17).

68. Hendrick asserts that he has spent an estimated $250,000 on improvements to the Property. (Hendrick Dep. at p. 26:15-18).

69. Hendrick's improvements to the buildings began prior to signing the written Agreement. (Hendrick Dep.at p. 26:19-27:4).

70. Hendrick said that he did not obtain any permits for work performed on the Property. (Hendrick Dep. at p. 34:20-35:5).

71. The estimated improvements to the Property of $250,000 include $170,000 in costs and the remainder for time. (Hendrick Dep. at p. 38:1-14).

72. At the end of 2022, Plaintiffs and Damiani decided to finalize the Agreement. (Hendrick Dep. at p. 16:10-14).

73. Hendrick and Damiani had their attorneys draft up an Agreement of Sale. (Hendrick Dep. at p. 17:7-12).

74. Billy Boy Real Estate and Damiani entered into an Agreement of Sale pursuant to which Plaintiffs agreed to purchase the Property from Damiani for $1,500,000.00. (ECF #15, ¶6; Hendrick Dep. at p. 19:5-7; *Agreement of Sale,* marked as "Exhibit 13").

75. The Agreement was executed by the parties in January of 2023. (Hendrick Dep. at p. 18:1-5).

76. The Agreement called for two payments by Hendrick of $300,000.00 and five (5) years of payments toward the remaining balance of the total cost. The Agreement was executed by the parties in January of 2023. (Hendrick Dep. at p. 18:1-5).

77. At the time of the Agreement the utilities were still in Damiani's name. (Hendrick Dep. at p. 19:12-16).

78. Billy Boy Contracting paid Damiani $100,000 on January 17, 2023, $100,000 to February 20, 2023, and $100,000 on May 25, 2023. (Hendrick Dep. at p. 20:8-14).

79. Another payment of $300,000 was made on April 3, 2024. (Hendrick Dep. at p. 21:2-5).

80. Hendrick also paid a monthly payment which was counted towards the purchase of the Property. (Hendrick Dep. at p. 21:12-14).

81. These monthly payments continued from January 2023 through to September 2024. (Hendrick Dep. at p. 23:1-6).

82. The Township had called Damiani, and he said, "I can't sell the property to you" because he had sold it to Eddie Hendrick. (Hendrick Dep. at p. 29:11-14).

83. Hendrick confirmed that he spoke with Hamaday in 2023 regarding the Township's interest in purchasing the Property. (Hendrick Dep. at p. 29:2-30:1).

84. Hendrick had a conversation with Township Inspector, Brian Sakal prior to the condemnation where Hendrick told Sakal he had purchased the Property. (Hendrick Dep. at p. 30:21-31:9).

85. A few months later, he spoke with Sakal again, who questioned if he had indeed bought the property. Hendrick replied yes. Sakal seemed unsure. (Hendrick Dep. at p. 31:10-20).

86. No complaints have ever been made against the Property under Hendrick's operation. (Hendrick Dep. at p.47: 2-9).

87. The Agreement of Sale was never recorded with the County Recorder of Deeds. (Hendrick Dep. at p. 23:7-11).

88. The Agreement was not recorded because the title search took longer than expected, and by the time the Agreement was ready to be recorded, the Property had already been transferred to the Township. (Hendrick Dep. at p. 23:15-24).

89. Once Hendrick learned that Damiani no longer owned the property, they agreed to seek an attorney's advice to figure out how to deal with this situation. (Hendrick Dep. at p. 24:17-24).

90. Hendrick learned of the taking from Damiani who had received a phone call from the Township stating that he did not reply to the Notice of Taking. (Hendrick Dep. at p. 27:14-28:4).

91. Hendrick was not issued notice of the condemnation. (Hendrick Dep. at p. 34:2-6).

92. At no point prior to that understanding did Damiani ever tell Hendrick that the Township was ever interested in purchasing the property. (Hendrick Dep. at p. 28:12-16).

93. Hendrick was not aware of any prior attempt by the Township to purchase the Property from Damiani. (Hendrick Dep. at p. 50:13-15).

94. Hendrick was never told that the Township had previously attempted to purchase the Property from Damiani in 2008 or 2009. (Hendrick Dep. at p. 50:16-21).

E.  **THE TOWNSHIP'S DECISION TO ACQUIRE THE PROPERTY**

95. After receiving notice that the Property was under agreement, the Township checked monthly property transfers to see if the Property changed hands throughout 2022 to 2023. (Hamaday Dep. at p.33:18-23).

96. The Township performed multiple Deed Transfer checks to see if the Agreement went through prior to the condemnation. (Garzillo Dep. at p. 109: 4-8).

97. In the later part of 2023, Hamaday once again contacted Daminai, who said that the Property had been sold for $1.5 million dollars and would be transferred by the end of 2023. (Hamaday Dep. at p.35:8-36:4).

98. The Township waited to see when the purchase went through to determine who the owner was to provide notice to. (Hamaday Dep. at p. 34:2-13).

99. The Township moved forward with condemnation because Damiani did not agree to sell the Property to the Township. (Hamaday Dep. at p. 34:21-22).

100. Hamaday did not reach out to Hendrick because Damiani was still the owner of record on the Property. (Hamaday Dep. at p. 40:2-4).

101. The Township always dealt with Damiani as he was the owner of the parcel. (Garzillo Dep. at p. 64:20-21).

102. The Township could not negotiate with somebody who was not the owner of the Property. (Hamaday Dep. at p. 40: 23-24)

103. In early 2024 a renewed appraisal was completed to update the appraisal from 2021. (Hamaday Dep. at p. 48:16-24; *2024 Appraisal Report,* marked as "Exhibit 14")

104. The appraised value was $912,000. (Hamaday Dep. at p. 49:11).

105. The Township's decision to move forward with condemning the property was made in late 2023. (Hamaday Dep. at p.34:16-17).

106. No Deed transfer had been made at the time that the condemnation proceedings began in March of 2024. (Hendrick Dep. at p. 52:15-20).

107. Garzillo was aware that the property transfer records showed that the Property had not been transferred from Damiani. (Garzillo Dep. at p. 63:13-23).

108. Garzillo said the Township decided to condemn the property because Damiani wanted more than the appraised value. (Garzillo Dep. at p. 62:11-14).

109. The Township moved forward with the condemnation to create additional facilities. (Garzillo Dep. at p. 68:11-12).

110. There were also negotiations with the school district to use Township land to install tennis courts, which would be facilitated with acquisition of the Property. (Garzillo Dep. at p. 70:15-22).

111. Also, the fact that the money had been allocated for open space, and it was possible that the funding could be used elsewhere if the budgeted amount was not spent (Garzillo Dep. at p. 73:18-22).

112. On March 21, 2024, the Township Board of Supervisors met and held an executive session for the purpose of legal and real estate matters. (ECF #15, ¶10).

113. Later that day, at the public meeting held on March 21, 2024, the Board adopted a resolution to condemn the Property. (Hamaday Dep. at p. 54:12-13; 55:4-5; Garzillo Dep. at p. 60:13-21; *3/21/2024 Board of Supervisors Meeting Agenda,* marked as "Exhibit 15"*; 3/21/2024 Board of Supervisors Meeting Minutes,* marked as "Exhibit 16").

114. Following the condemnation, Hamaday personally delivered the Condemnation Notice to Damiani. (Hamaday Dep. at p. 63:9-11, 15-17).

115. Although the Township prioritizes purchasing open space, they also would not want to lose a business. (Garzillo Dep. at p. 85:17-18).

116. Hendrick had not reached out to the Township for assistance in identifying a different area of operation. (Garzillo Dep. at p. 85:18-24).

117. The Township assists other companies in identifying other locations for operating their businesses in the Township. (Garzillo Dep. at p. 86:3-7; 86:11-13).

118. Hendrick's race played no role in the decision to condemn the Property. (Garzillo Dep. at p. 95:15-19).

F.  **THE CONDEMNATION PROCEEDINGS**

119. On March 22, 2024, the Township filed in the Court of Common Pleas of Montgomery County, Pennsylvania, at Docket Number 2024-05366, a Declaration of Taking,

13

condemning the Property as of that date. (ECF #15, ¶7; *Declaration of Taking Montco No. 0*, marked as "Exhibit 17").

120. In the Declaration of Taking, the Township's stated purpose for condemning the Property was for the recreational use and benefit of the public. (ECF #15, ¶8; Montco. No. 0).

121. On April 25, 2024, Plaintiffs filed a Petition to Intervene in the Montgomery County Condemnation Proceedings. (ECF #15, ¶11; *Petition to Intervene - Montco. No. 4*, marked as "Exhibit 18").

122. Plaintiffs' Petition specifically alleged that the taking was for an unlawful, illegal, and improper purpose, in that the Township's decision to condemn the property was racially motivated to exclude a minority owner from the Township. (Montco. No. 4 at ¶¶6, 9, 10).

123. On April 29, 2024, Damiani, as record owner, filed Preliminary Objections to the Declaration of Taking in the Montgomery County Condemnation Proceedings. (ECF #15, ¶12; *Preliminary Objections - Montco. No. 7*, marked as "Exhibit 19").

124. On June 26, 2024, the Montgomery County Court of Common Pleas granted Plaintiffs Petition to Intervene in the Montgomery County Condemnation Proceedings. (ECF #15, ¶13).

125. On September 11, 2024, the Honorable Steven C. Tolliver of the Montgomery County Court of Common Pleas held a one-day hearing in the Montgomery County Condemnation Proceedings on the Preliminary Objections to the Declaration of Taking. (ECF #15, ¶14; Montco. No. 28, *9/11/2024 Hearing Transcript*, marked as "Exhibit 20").

126. On September 17, 2024, Judge Tolliver issued an Order and Memorandum overruling the Preliminary Objections to the Declaration of Taking, and concluding that no evidence was presented to establish that the Township was guilty of fraud, bad

faith, or an abuse of discretion concerning its stated purpose for the taking. (ECF #15, ¶15; *09/17/2024 Order and Memorandum Opinion - Montco. No. 28*, marked as "Exhibit 21").

127. Further, the Court specifically determined that "the evidence does not support racial motivations for the taking, as the evidence shows that the Township is expanding the land it already owns through this taking." (Montco. No. 28 at p. 10.).

128. In the Order, Judge Tolliver directed the Township to pay to the Court estimated just compensation of $905,524.04, after which time, pursuant to Section 307(a)(1)(iv) of the Pennsylvania Eminent Domain Code, the Township would be entitled to possession of and right of entry upon the Property within sixty (60) days. (ECF #15, ¶16; Montco. No. 28).

129. In the Order, Judge Tolliver further stated that Damiani and the Plaintiffs could proceed to a final determination of just compensation under the Pennsylvania Eminent Domain Code. (ECF #15, ¶17; Montco. No. 28).

130. The amount of compensation paid by the Township for the subject property was $905,524.04; this amount was derived from the appraised value of $912,000 less unpaid real estate taxes. (Designee Dep. at p. 12:18-23) .

131. On October 8, 2024, the Township deposited the estimated compensation of $905,524.04 in escrow with the Court. (See, Docket Montco. No. 29).

132. On November 4, 2024, Billy Boy and Damiani petitioned for appointment of a Board of Viewers. (See, Docket Montco. No. 31).

133. On November 7, 2024, the Petition was granted, and a board of viewers was appointed, pursuant to 26 P.a.C.S. § 101 *et.sec.* to determine and report to the Court the total just compensation and damages to be awarded regarding the condemnation. (*Order Granting Petition for Appointment of Board of Viewers - Montco. No. 32*, marked as "Exhibit 22").

134. On November 26, 2024, the Court issued an Order vacating the prior appointment of a Board of Viewers based on the recusal of the Judge. A new board was appointed. (*Order for Appointment of Board of Viewers - Montco No. 40*, marked as "Exhibit 23").

135. On December 10, 2024, Damiani and Plaintiffs filed a Petition to distribute estimated just compensation to acquire alternative property. (Montco No. 41).

136. On January 3, 2025, the Township filed a Writ of Ejectment. (Montco No. 47).

137. On February 5, 2025, the Parties filed a Stipulation regarding the status of the condemnation and payment of the estimated just compensation to acquire an alternative property. (*Stipulation of the Parties - Montco. No. 55*, marked as "Exhibit 24").

138. The stipulation provides that:

   a. Louis A. Damiani is the sole legal titled owner of the condemned property, entitled to receive all the funds paid or may be paid for damages for the fair market value of the property. (Montco. No. 55 at ¶1).

   b. Damiani and Plaintiffs agreed to a distribution of just compensation between themselves. (Montco. No. 55 at ¶2).

   c. Any additional damage payments awarded in the condemnation concerning reasonable value shall be issued to Damiani solely and not to Plaintiffs. (Montco. No. 55 at ¶3).

   d. Plaintiffs had an equitable interest in the ongoing use and occupancy of the Property arising from the Agreement. (Montco. No. 55 at ¶4).

   e. The Parties agree that the Property was not subject to or encumbered by a bona fide mortgage or other debt secured by the Property, applicable to either Plaintiffs or Damiani. (Montco. No. 55 at ¶4).

    f. "The Parties agree that any value of the [Plaintiffs'] equitable interest in the Property to [Damiani] would be reflected in the underlying fair market value of the Property itself, for the Property's claimed highest and best use, and not as a claim for additional damages." (Montco. No. 55 at ¶4).

    g. Plaintiffs can seek damages as a tenant through the board of viewers for relocation costs. (Montco. No. 55 at ¶4).

    h. While it is agreed that Plaintiffs made improvements to the Property, Plaintiffs are barred from pursuing damages for claims against the Township for such improvements "and shall make no claims against the [Township] related to the value, occupancy, use or other possessory or ownership interest in or for the Property." (Montco. No. 55 at ¶5).

    i. The parties agree that apart from the needed relocation of equipment and vehicles to the new business site the Township has not interrupted or diminished Damiani or Plaintiffs' business operations. (Montco. No. 55 at ¶15).

139. Hendrick signed the Stipulation of the parties. (Hendrick Dep. at p. 56:13-24).

140. Hendrick reviewed the Stipulation and had the opportunity to discuss questions prior to signing. (Hendrick Dep. at p.57:3-10).

141. On February 7, 2025, the Court recognized that Stipulation, further ordering distribution of the estimated just compensation. (*Order Regarding Stipulation - Montco. No. 56*, marked as "Exhibit 25").

142. On February 13, 2025, an Order was issued to distribute the just compensation to Damiani. (See, Docket Montco. No. 57).

143. On February 20, 2025, the just compensation held in escrow was disbursed. (Montco. No. 58).

144. The Condemnation proceeding remains pending; no decision from the board of view has been issued. (*See, Montgomery County Court of Common Pleas Docket for No. 2024-05366*, marked as "Exhibit 26").

145. As of the date of the deposition (March 26, 2025) physical possession is maintained by Hendrick and Damiani. (Hamaday Dep. at p. 69:19-21).

### G. **DAMAGES**

146. Hendrick has recovered $600,000.00 from Damiani post-condemnation. (Hendrick Dep. at p. 25:22-24).

147. Hendrick says he has not been compensated for improvements to the building. (Hendrick Dep. at p. 25:17-21).

148. Hendrick is seeking damages for compensation regarding the moving of his business. (Hendrick Dep. at p. 39:20-23).

149. Hendrick moved his physical property from the Property to the new property by using his own equipment and employees and Abel Brothers Towing. (Hendrick Dep. at p. 40:21-41:6).

150. The move to the new location took approximately three (3) weeks. (Hendrick Dep. at p. 41:20-23).

151. Plaintiffs are seeking damages for disruption to operations, and additional expenses for being further from job sites. (Hendrick Dep. at p. 40:10-11; 40:13-15).

152. Hendrick will also seek damages for stress of the move and the taking of the Property. (Hendrick Dep. at p. 44:21-24).

**H.    EVIDENCE OF RACIAL DISCRIMNAITON**

153.    Hendrick says that the Township's actions were racially motivated because a white company had operated out of the Property for forty to fifty years and were not harassed, nor asked to buy or sell. (Hendrick Dep. at p.46:12-17).

154.    Hedrick said that he moved in, cleaned up the property; the Township found out he was the owner; saying that "I'm not going to sell" and then the Township condemned the Property. (Hendrick Dep. at p. 46:18-23).

155.    "So, with saying that, I could only say that it is one thing. It is because I am Black. I mean, it's rigged. You can see it. There is no reason." (Hendrick Dep. at p.47:10-13).

156.    When asked on what the basis the Township's actions were racially motivated, Hendrick said, "knowing what I know right now after seeing all the facts, there is nothing else- this is clear that this is racially motivated." (Hendrick Dep. at p. 50:22- p. 51:6).

157.    Hendrick stated that activity he characterized as harassment was entering the property, such as having surveyors visit, which only took place after the condemnation proceedings began. (Hendrick Dep. at p. 47:23-48:14).

**I.    COMPARATOR PROPERTIES**

158.    The Township has discussed acquiring additional properties for use as open space, to include: a parcel adjacent to Hauser Park owned by Norfolk Southern Railroad; a portion of that railroad property partitioned and sold to Mayfield Site contractors; and a third property along the Schuylkill River and the Township's boathouse owned by Ratoskey and Trainor Landscaping. (Garzillo Dep. at p. 80, 4-14; Hamaday Dep. at p. 82:12-21).

159.    Appraisals were performed on these properties. (Hamaday Dep. at p. 83:3-9).

19

160. The values were $4 million for the Ratoskey property; and $300,000 total for the Norfolk Southern and Mayfield properties. (Hamaday Dep. at p. 84:9-13).

161. Property owned by a railroad cannot be condemned. (Hamaday Dep. at p. 83:20-21).

162. The Township's intended purpose for these other properties would be to add open space to adjoining Township owned properties. (Hamaday Dep. at p. 85:21-86:1).

163. The Township is currently in the process of purchasing a property on Henderson Road named the Rossi Salvage Property ("Rossi Property"). (Garzillo Dep. at p. 18:12-16).

164. The Rossi Property was the target of acquisition by Toll Brothers for development, which fell through because of zoning issues. (Garzillo Dep. at p. 34:5-11).

165. This property was considered for condemnation, but there is currently an agreement for the purchase of the property with the owner. (Garzillo Dep. at p. 19:3-10).

166. The purpose of this acquisition is to complete a roadway for access into a new development. (Garzillo Dep. at p. 20:15-22).

Respectfully submitted,

**SIANA LAW**

Date: <u>April 10, 2025,</u>   By: _[signature]_

Andrew M. Rongaus, Esquire, ID #87423
Theodore T. Speedy, Jr., Esquire, ID #330386
Attorneys for Defendants *Upper Merion Township, Board of Supervisors, Tina Garzillo, William Jenaway, Greg Waks, Greg Philips, Carole Kenney, and Anthony Hamaday*
941 Pottstown Pike, Suite 200
Chester Springs, PA 19425
(P): 610.321.5500 (F): 610.321.0505
amrongaus@sianalaw.com ttspeedy@sianalaw.com