**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BILLY BOY REAL ESTATE LLC,** | : | **CIVIL ACTION** |
| **BILLY BOY CONTRACTING LLC,** | : | |
| **EDDIE HENDRICK** | : | |
| | : | |
| **v.** | : | **No. 24-5559** |
| | : | |
| **UPPER MERION TOWNSHIP, UPPER** | : | |
| **MERION TOWNSHIP BOARD OF** | : | |
| **SUPERVISORS, TINA GARZILLO,** | : | |
| **WILLIAM JENAWAY, GREG WAKS,** | : | |
| **GREG PHILIPS, CAROLE KENNEY,** | : | |
| **ANTHONY HAMADAY** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                  **May 1, 2025[1]**

We today address concerns arising when a local government takes real property for recreational purposes which has the effect of depriving a minority-owned business from closing on a purchase of the real property for its business. A largely commercial and mostly White populated township has long looked to acquire over an acre of property adjacent to land it already owned for public space. It attempted unsuccessfully to purchase this property several times. The property owner—a White man—instead agreed to sell the property to a minority-owned business. The owner of the minority-owned business, a Black man, seemingly did not know of the township's longstanding interest in this property when he first orally agreed and later signed a contract to purchase the property. The township declared its intent to take the property by way of condemnation and pay fair compensation under Pennsylvania law. Both the White property owner and the minority businessowner hoping to close on the sale sued in state court objecting to the condemnation. One of their objections accused the Township of racial animus. The state court judge held an extensive evidentiary hearing and made specific findings, including finding no

evidence of racial animus. The minority businessowner nevertheless sued the township and its supervisors for violating his equal protection and due process rights as well as Pennsylvania state law claims for abuse of process and tortious interference with his agreement to purchase the land.

It seems the state court judge decided the same issue and we would be precluded from revisiting the factual basis of this issue, but the township does not specifically argue this point (although it pleaded issue preclusion as an affirmative defense months ago). So, we turn to evaluating the evidence after discovery. We find the minority businessowner did not adduce evidence the township's decision to condemn this land was motivated by racial animus. We understand he is disappointed in losing this business opportunity, but his disappointment cannot be directed towards the township. We grant the township and its supervisors summary judgment dismissing the federal claims with prejudice and declining to exercise supplemental jurisdiction over the two state law claims.

## I.    Undisputed Material Facts

Louis A. Damiani owns a 1.13-acre parcel containing a large garage facility and enough open land to store large trucks in Upper Merion Township (the Property).[2] Upper Merion is a predominantly White township, and White-owned businesses occupied the Property from the early 1950s until January 2023.[3]

### *The Township's interest in purchasing the Property.*

The Township has owned three parcels of real estate adjacent to the Property for decades: one parcel occupied by Walker Park, and two additional parcels of land which make up the Mullen Tract.[4] The Township purchased the Walker Park parcel almost seventy years ago; it purchased the Mullen Tract parcels thirty years ago.[5] A creek and wooded area separate the Township's parcels of real estate from the Property.[6]

The Township has long been interested in acquiring the Property because it is adjacent to Walker Park and the Mullen Tract.[7] The Township considered multiple possible uses for the Property: to create a dog park, to expand the land adjacent to a path through the Mullen Tract known as the Crow Creek Trail, to provide extra land next to the athletic fields, to move baseball fields at risk of flooding, or simply to create more active open space.[8]

The Township tried to buy the Property and appraised its value multiple times over the years. The Township, for example, offered to buy the Property from Mr. Damiani in 2008 but Mr. Damiani rejected the offer as too low.[9] The Township contracted with an appraisal company to conduct an appraisal of the Property in 2009.[10] Years passed. The Township learned in 2020 Mr. Damiani might be interested in selling the Property.[11] Mr. Damiani granted Township Manager Anthony Hamaday leave to appraise the Property in August 2021.[12] This 2021 appraisal placed the Property's value between $940,000 and $970,000.[13] The Township's Board of Supervisors included the prospective purchase of the Property in its 2022 budget and bond issue, which also involved the potential condemnation of other properties.[14]

### Mr. Damiani makes other plans.

But Mr. Damiani had other plans for the Property. Eddie Hendrick, the African American owner of a local trucking businesses, had been operating his business out of neighboring East Norriton Township when someone told him he should speak to Mr. Damiani about a possible new location for his business.[15] Mr. Hendrick's business, Billy Boy Contracting, LLC, provides contract work, hauling, excavation, and utility services for the City of Philadelphia and the Philadelphia Airport.[16] Mr. Hendrick contacted Mr. Damiani about buying the Property and the two men had a series of conversations sometime before August 2022.[17] The sale agreement between Mr. Hendrick and Mr. Damiani began as an informal arrangement.[18] They started with a "handshake agreement" because they wanted to give Mr. Hendrick time to improve the Property to the point he could

operate his business from it comfortably before entering a formal agreement.[19] Mr. Damiani did not tell Mr. Hendrick about the Township's earlier attempts to purchase the Property.[20]

### The Township renews its efforts to acquire the Property.

Township Manager Hamaday visited the Property in August 2022 and again asked Mr. Damiani if he would consider selling the Property.[21] Mr. Damiani told Township Manager Hamaday he had already sold the Property to Eddie Hendrick and/or a company called Billy Boy for $2 million.[22] Township Manager Hamaday asked Mr. Damiani to have Mr. Hendrick contact him.[23]

Township Manager Hamaday then conducted an internet search and identified Billy Boy as a minority-owned business.[24] He told Tina Garzillo, the Chair of the Township's Board of Supervisors, Mr. Damiani had agreed to sell the Property to a minority-owned business.[25] The Township became unsure whether a sale actually occurred when the Township Solicitor checked the Recorder of Deeds and found no deed transfer for the Property.[26]

Mr. Hendrick called Township Manager Hamaday at some point in 2022 or 2023 and told him the Property "was under agreement;" Township Manager Hamaday asked Mr. Hendrick to call the Township if the sale went through because the Township wanted to buy it.[27]

### Mr. Hendrick improves the Property and formalizes his agreement to purchase it.

Mr. Hendrick moved his business to the Property in August or September of 2022 under his informal arrangement with Mr. Damiani.[28] He worked on the Property for three or four months until he felt comfortable he could operate his business from there.[29] He and Mr. Damiani decided to finalize their agreement at the end of 2022.[30] Their attorneys drafted an agreement of sale confirming Mr. Hendrick would purchase the Property from Mr. Damiani for $1.5 million.[31] Mr. Hendrick would pay Mr. Damiani two sums of $300,000 each and would then have five years to pay the remainder of the $1.5 Million purchase price.[32] The parties signed the agreement in January

2023.[33] Mr. Hendrick made payments to Mr. Damiani from January 2023 through September 2024.[34]

The Township waited to see if the Property would transfer to a new owner, but by the end of December 2023, it still had not transferred.[35]

### The Township's interest in other properties at the same time.

The Township discussed acquiring other properties for open space including a parcel adjacent to Hauser Park owned by Norfolk Southern Railroad, another portion of railroad property partitioned and sold to contractors, and a third property along the Schuylkill River and the Township's boathouse owned by a landscaping company.[36] The Township has had each of these properties appraised.[37] Its intended purpose for these properties would be to add open space to adjoining properties already owned by the Township.[38] The Township is also in the process of purchasing a property on Henderson Road named the "Rossi Property" to complete a roadway for access into a new development.[39] The Township considered condemning the property but ultimately entered an agreement with the property owner to instead purchase the property.[40]

### The Township condemns the Property.

The Township decided to condemn the Property despite its muddled ownership status in late 2023.[41] The Township did not reach out to or try to negotiate with Mr. Hendrick.[42] The Township re-appraised the Property in early 2024.[43] The 2024 appraisal placed the Property's value at $912,000.[44] The Township Board of Supervisors held an executive session to discuss legal and real estate matters on March 21, 2024, and adopted a resolution to condemn the Property at a public meeting later the same day.[45] The Property still had not been transferred to Mr. Hendrick at the time the condemnation proceedings began in March 2024.[46] Township Manager Hamaday personally delivered the condemnation notice to Mr. Damiani.[47] Mr. Damiani told Mr. Hendrick of the condemnation on April 8, 2024.[48]

*Mr. Hendricks unsuccessfully challenges the taking in state court.*

The Township filed a declaration of taking in the Montgomery County Court of Common Pleas on March 22, 2024.[49] The Township stated purpose for condemning the Property was for recreational use and benefit of the public.[50] Mr. Hendrick petitioned to intervene in the condemnation proceedings on April 25, 2024.[51] He alleged the Township condemned the Property for an unlawful and improper purpose as racially motivated and intended to exclude a minority business owner from the Township.[52] Mr. Damiani, as record owner, filed preliminary objections to the Declaration of taking a few days later.[53] Mr. Damiani joined Mr. Hendrick in alleging racial animus motivated the Township to condemn the Property.[54]

The Montgomery County Court of Common Pleas granted Mr. Hendrick's petition to intervene, and Judge Tolliver held an evidentiary hearing on the preliminary objections.[55] Judge Tolliver then issued an Order and Memorandum overruling the preliminary objections.[56] He found no evidence adduced at the hearing allowing him to find fraud, bad faith, or an abuse of discretion as to the Township's stated purpose for the taking.[57] No evidence established racial motivations for the taking as "the Township is expanding the land it already owns . . . ."[58] Judge Tolliver directed the Township pay to the court the estimated just compensation of $905,524.04 (derived from the Property's appraised value of $912,000 minus unpaid real estate taxes), to be held in escrow.[59] Judge Tolliver further directed Mr. Hendrick and Mr. Damiani to proceed in the pending case to a final determination of the just compensation.[60]

Messrs. Hendrick and Damiani timely petitioned to appoint a board of viewers on November 4, 2024.[61] Judge Tolliver granted the petition three days later and appointed a board to determine and report to the Court the total just compensation and damages to be awarded for the condemnation.[62] Messrs. Hendrick and Damiani petitioned to distribute estimated just compensation to acquire alternative property on December 10, 2024.[63] The Township filed a writ

of ejectment on January 3, 2025.[64] The parties filed a stipulation in state court on February 5, 2025 providing, among other things: Mr. Damiani was the sole legal titled owner of the Property before the taking; Messrs. Hendrick and Damiani agreed to a distribution of just compensation between themselves; any additional damages awarded in the condemnation proceeds would be issued solely to Mr. Damiani; Mr. Hendrick had an equitable interest in the ongoing use of the Property; Mr. Hendrick could seek damages as a tenant through the board of viewers for relocation costs; and, although Mr. Hendrick made improvements to the Property, he cannot seek damages from the Township for those improvements.[65] The parties further agreed the Township would withdraw its writ of ejectment and Mr. Damiani and/or Mr. Hendrick would have ninety days to vacate the Property after Judge Tolliver signed their stipulation.[66] Judge Tolliver recognized the stipulation as part of the record and ordered the Prothonotary to pay Mr. Damiani the $905,524 estimated just compensation held in escrow.[67] The Prothonotary disbursed the money on February 20, 2025.[68]

The condemnation proceeding is still pending as the board of viewers has not yet rendered a decision concerning the total just compensation and damages to be awarded.[69] Mr. Hendrick recovered $600,000 from Mr. Damiani post-condemnation but did not receive compensation for his improvements to the Property.[70] He moved his equipment from the Property to a new location in Phoenixville.[71]

### *Mr. Hendrick then sues here again claiming racial animus.*

Mr. Hendrick and his minority-owned entities sued the Township and its Board of Supervisors in this Court on October 20, 2024—approximately one month after Judge Tolliver overruled Mr. Damiani's preliminary objections and found no evidence of racial animus.[72] He alleged, notwithstanding Judge Tolliver's detailed findings, the Township condemned the Property based on its racial animus intended to exclude a Black-owned business from the predominantly

White Township in violation of the Equal Protection Clause and the Due Process Clause.[73] He also

pleaded state law claims for abuse of process and tortious interference with contractual relations.[74]

## II.    Analysis

The Township now moves for summary judgment.[75] Mr. Hendrick opposes.[76] We grant

summary judgment in favor of the Township on all claims finding no genuine issue of material

fact on the federal claims and declining to exercise supplemental jurisdiction over the abuse of

process and tortious interference claims.

### A.    The state court already decided Mr. Hendrick's racial animus claims which may result in issue preclusion but the Township did not argue preclusion.

The fact Mr. Hendrick asks us to find the Township's racial animus after Judge Tolliver

found no evidence of racial animus should trigger a federal lawyer's scrutiny as to how a federal

court can now review the same issue.  The Township apparently thought of issue preclusion as

evidenced in its affirmative defenses.  But it today argues a different theory.  The Township argues

we cannot overturn Judge Tolliver's post-hearing decision finding no racial animus under the

*Rooker-Feldman* doctrine.[77] Mr. Hendrick does not respond to this argument but we cannot ignore

the obvious concern.

The Township chose the wrong theory to argue on summary judgment although it plead the

correct affirmative defense.  The *Rooker-Feldman* doctrine does not apply.  Four requirements must

be met for *Rooker-Feldman* to apply: "(1) the federal plaintiff lost in state court; (2) the plaintiff

'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered

before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and

reject the state judgments."[78] The *Rooker-Feldman* doctrine bars subject matter jurisdiction in

federal court where "the federal plaintiff [is] complaining of legal injury caused by a state court

judgment because of a legal error committed by the state court."[79] The *Rooker-Feldman* doctrine

***does not*** bar our jurisdiction where the plaintiff "is complaining of legal injury caused by the adverse party."[80] "If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"[81]

The facts today do not preclude us from exercising our jurisdiction under *Rooker-Feldman*. Mr. Hendrick alleges the Township caused his alleged injuries, not Judge Tolliver's decision. We do not read his Complaint as asking us to vacate or overrule Judge Tolliver's decision despite the fact we would have to disregard Judge Tolliver's legal conclusions to find the Township acted out of racial animus. The problem of denying a state judge's legal conclusion is not a jurisdictional issue under *Rooker-Feldman*; it is a preclusion issue.[82]

But we find the doctrine of collateral estoppel, or issue preclusion, likely bars most or all of Mr. Hendrick's claims.[83] "When a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. § 1738 to give full faith and credit to the state judgment and, in section 1983 cases, apply the same preclusion rules as would the courts of that state."[84] "Pennsylvania courts require the party asserting issue preclusion to establish four elements: '(1) an issue decided in a prior action is identical to the one presented in a later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.'"[85] "[W]here a defendant's alleged discrimination was resolved in a prior case and is raised in a subsequent case based on the same facts, it is barred by the doctrine of issue preclusion even if the issue recurs in the context of a different claim."[86]

Mr. Damiani, with Mr. Hendrick as intervenor, filed preliminary objections to the taking, one of which complained the taking of the Property was racially motivated.[87] Judge Tolliver concluded the evidence did not establish the Township knew a minority-owned business had purchased the property as the deal was not made public; nor did the evidence establish the Township knew Mr. Hendrick had acquired the property because it still legally belonged to Mr. Damiani during the taking.[88] The evidence confirmed the Township had a longstanding interest in acquiring the Property and it was just expanding the land it already owned.[89] Judge Tolliver found "imputation of any racially motivated actions to the Board of Managers is hard-pressed under these circumstances[,]" and overruled the preliminary objections.[90]

The first, third, and fourth elements of issue preclusion are easily met here. The first element requires the issue be identical to an issue in an earlier case. Mr. Damiani, with Mr. Hendrick as intervenor, challenged the Township's taking of the Property as racially motivated in the Montgomery County Court of Common Pleas.[91] Both of Mr. Hendrick's constitutional claims and at least one of his state law claims in the present case require a finding of racial animus.[92] The third and fourth elements are also satisfied. Mr. Hendrick, as intervenor, is a party to the case in state court. He had the opportunity to fully litigate the issue of racial animus when Judge Tolliver held an evidentiary hearing "to allow the parties an opportunity to present evidence on the factual issues presented in [the] preliminary objections."[93]

The second element—a final judgment on the merits—is slightly less straightforward but, on balance, also weighs in favor of preclusion. We must determine whether Judge Tolliver's order overruling Mr. Damiani's preliminary objections constitutes a final judgment on the merits. "[W]hether an order is sufficiently final to be given collateral estoppel effect depends to a large extent on the appealability of the order."[94] As relevant here, "[a]n appeal may be taken as of right

from an order overruling preliminary objections to a declaration of taking" in Pennsylvania.[95] We also "consider whether the 'parties were fully heard [and whether] the court supported its decision with a reasoned opinion.'"[96] Judge Tolliver held a day-long evidentiary hearing to permit the parties to present evidence and issued a well-reasoned memorandum with his order overruling the preliminary objections. The order overruling the preliminary objections appears to be a final decision on the merits.

Although all four elements of issue preclusion are seemingly satisfied in this case, we decline to rest our decision on this doctrine. The Township raised issue preclusion as an affirmative defense but did not argue it in its Motion for summary judgment, deciding instead to hang its hat on the *Rooker-Feldman* doctrine. As a result, Mr. Hendrick is not on notice of issue preclusion as a basis for summary judgment. We find issue preclusion would bar the re-litigation of the Township's racial animus and recognize we could dismiss based on the affirmative defense. But because the doctrine has not been fully briefed, we find it more prudent to also address the merits of Mr. Hendrick's constitutional claims.

### B.    We grant the Township's Motion for summary judgment on Mr. Hendrick's substantive due process claim.[97]

The Township moves for summary judgment on Mr. Hendrick's substantive due process claim, arguing its taking of the Property does not shock the conscience.[98] Mr. Hendrick responds genuine issues of material fact remain with regard to the Township's conduct.[99] We agree with the Township: assuming Mr. Hendrick has an interest in the Property, he fails to establish the Township's actions shock the conscience.

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience."[100] "The 'shocks the conscience' standard encompasses

'only the most egregious official conduct.'"[101] "[M]erely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision."[102] Our Court of Appeals "has held that inconsistent application of zoning requirements, delaying permits and approvals, improperly increasing tax assessments, and maligning and muzzling a property owner, without more, is not the type of behavior that shocks the conscience."[103] "To shock the conscience, the complained of behavior must be coupled with allegations of corruption, self-dealing, unconstitutional 'taking,' ethnic bias, or interference with otherwise constitutionally protected activity."[104]

The Township argues the only evidence supporting racial bias is the unsubstantiated opinion testimony of Mr. Hendrick.[105] Mr. Hendrick testified he thought the Township's actions were racially motivated because a White company operated the Property for fifty years, doing the same type of work as Mr. Hendrick, and the Township did not ask the White owner to sell the Property; nor did it condemn the Property until Mr. Hendrick took over.[106] He further testified: "So, with saying that, I could only say that it's one thing. It's because I'm black. I mean, it's rigged. You can see it. There's no reason."[107] The Township refutes this testimony by pointing out its interest in the Property long predated Mr. Hendrick's association with it, as evidenced by the Township's attempt to purchase the Property in 2008 and its appraisals of the Property in 2009 and 2021.[108] We find the portions of the record establishing the Township tried to acquire the Property years before Mr. Hendrick contracted to purchase it are compelling evidence the decision to condemn was not racially motivated.

Mr. Hendrick argues the circumstances from August 2022 to March 2024 do not reflect a legitimate reason for the Township to condemn the Property and "the decision to do so cannot be characterized as mere coincidence."[109] He claims his equitable ownership of the Property is all that

changed from 2008 to 2024.[110] He argues the decision to condemn might be defensible if there some emergency or definitive plans necessitated the Township's development of the Property, but there was no emergency or definitive plans justifying condemnation of the Property in March 2024.[111]

We are not persuaded. Mr. Hendrick presents a false dichotomy by suggesting because the Township did not condemn the property until Mr. Hendrick owned it or was about to own it, the Township's decision must have been motivated by race. In fact, there could be any number of reasons the Township waited until March 2024 to condemn the Property. We are not asked to decide whether the Township's taking of the Property was proper; we are asked to decide whether it was racially biased. The absence of an emergency or definitive plans at the time of condemnation does not, without more, establish racial bias. "[T]o withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict that which is offered by the moving party."[112] Mr. Hendrick does not meet his burden.

Mr. Hendrick cites one case involving bias against an ethnic group, *Andrews v. Bureau of Codes Administrative Office*.[113] He does not explain how this case helps his substantive due process claim.[114] We conclude it does not. The property owner in *Andrews* claimed she was treated less favorably than other similarly situated property owners with respect to a condemnation order against her property.[115] She alleged, among other claims, violations of the equal protection clause and the substantive due process clause.[116] The property owner specifically identified other nearby, non-minority property owners who lived in condemned properties for ten or more years without prosecution and attached pictures and condemnation orders associated with the properties.[117] She identified eight other minority property owners who all sold or lost their property but were not given the same time to comply as the non-minority property owners.[118] She also "put forth

evidence . . . suggesting that at least one of the named Defendants made racially disparaging remarks regarding African Americans."[119] With respect to the substantive due process clause, Judge Rambo found "the nature of the alleged conduct satisfie[d] the 'shocks the conscience' standard" because the property owner adduced evidence suggesting the defendants exhibited disparate treatment toward minority homeowners as compared to similarly-situated non-minority property owners.[120] Judge Rambo found the property owner adduced sufficient evidence of racial bias to "narrowly survive[]" the local government's motion for summary judgment.[121]

The present case is plainly distinguishable from Judge Rambo's analysis. Unlike the property owner in *Andrews*, Mr. Hendricks has no evidence suggesting the Township decided to condemn the Property because he is Black. Without evidence of racial or ethnic bias, the Township's decision to wait until March 2024 to condemn the Property is no different than an inconsistent application of zoning requirements, a delayed permit or approval, or any of the other land-use decisions which do not rise to the level of "conscience-shocking" under our Court of Appeals's guidance.[122]

Mr. Hendrick does not adduce evidence from which a rational juror could find the Township acted out of racial bias. We grant summary judgment in favor of the Township on Mr. Hendrick's substantive due process claim.

### C.    We grant the Township's Motion for summary judgment on Mr. Hendrick's equal protection claim.

The Township also moves for summary judgment on Mr. Hendrick's equal protection claim. It argues the record does not establish the Township treated Mr. Hendrick differently because of his race; instead, the record shows the Township wanted to expand its open space by acquiring adjacent land.[123] Mr. Hendrick responds genuine issues of material fact remain as to

whether the Township's decision to condemn the Property violated his equal protection rights.[124] We again agree with the Township.

The equal protection clause "prohibits states from intentionally discriminating between individuals on the basis of race."[125] "The elements of an Equal Protection violation based on selective treatment are the following: (1) that Plaintiffs were treated differently from other similarly situated individuals, and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right.'"[126] "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects."[127] "In cases involving zoning or land-use disputes, courts consider 'the similarity of the properties being compared, including their physical characteristics and their "similarities in the eyes of a defendant."'"[128]

The parties agree the Township identified several parcels of land as possible targets of acquisition to purchase with the portion of the August 2022 $10 million bond issue earmarked for open space purchases: a parcel owned by a railroad and a parcel worth $4 million dollars, both of which it ultimately chose not to acquire.[129] The Township claims the parcel owned by the railroad and the $4 million parcel are not similar to the Property and the Township decided not to condemn them for rational reasons.[130] The Township also targeted a parcel named the "Rossi Property," possibly as early as 2019, which it is currently in the process of purchasing.[131] The Township claims the Rossi Property is not similar to the Property because it will be used for roadway access and the owner of the Rossi Property did not receive more favorable treatment than Mr. Hendrick because the Township reached an agreement of sale with the owner of the Rossi Property.[132]

Mr. Hendrick does not address whether the comparator properties are similarly situated to the Property. He instead responds with a more detailed version of the argument he asserted with

regard to the substantive due process clause: White owners have used the Property for over fifty years; the Township has been interested in the Property since 2008; the Township knew Mr. Hendrick is Black as of August 2022; the Township knew Mr. Hendrick planned to buy the Property since early 2023; and the Township had no emergency or specific plans for development of the Property when it adopted the resolution to condemn it in March 2024.[133] Mr. Hendrick argues the Township's earlier interest in the Property does not create a legitimate, non-discriminatory reason to condemn it, and "the only difference with respect to the Property from 2008 to 2024" was Mr. Hendrick's equitable ownership of it.[134] He claims the fact the Township considered several other non-minority-owned properties but did not condemn them supports the notion the condemnation of the Property was racially motivated.[135]

We first briefly consider whether the record indicates the Township treated Mr. Hendrick differently than other similarly situated individuals. We assume the other properties the Township considered acquiring and/or condemning are similarly situated to the Property because neither the Township nor Mr. Hendrick presents compelling argument on this point.[136] We also assume the Township treated the owners of at least some of these other properties (i.e., the properties targeted for open space) more favorably than Mr. Hendrick because it did not condemn their properties but it did condemn the Property.[137] We are not convinced the Township treated the owner of the Rossi Property more favorably than Mr. Hendrick, but we need not decide this question; either way, we find Mr. Hendrick cannot establish the second prong of his equal protection claim.[138]

Even assuming the Township treated Mr. Hendrick worse than similarly situated property owners, the second part of the equal protection claim requires Mr. Hendrick adduce evidence the selective treatment was based on his race. He "must demonstrate 'circumstantial evidence, beyond

evidence of the simple fact of differential treatment itself, from which a jury could reasonably infer that [the defendant's] actions were actually motivated by a racially discriminatory purpose.'"[139]

Mr. Hendrick does not adduce such evidence. We are guided by our Court of Appeals's analysis in *Thorpe v. Upper Makefield Township*.[140] Two property owners challenged the township's unfair zoning enforcement as motivated by racial animus toward Native Americans.[141] Our Court of Appeals affirmed Judge Rufe's grant of summary judgment for the township on the property owners' selective enforcement equal protection claim. The Court found "no evidence that race was the impetus for the different treatment. That is, nothing in the record suggest[ed] any nexus between Dale Thorpe's Native American race and the Township's zoning enforcement actions."[142] It is the same in this case. There is simply no evidence of a nexus between Mr. Hendrick's race and the decision to condemn his Property.

Mr. Hendrick then begins to speculate: it could not have been a coincidence the Township decided to condemn the Property around the time Mr. Hendrick was in the process of purchasing it.[143] But this argument is conclusory and speculative. It resembles the equal protection argument the recipients of a public nuisance citation (an interracial couple) made in *Homan v. City of Reading*: "what else could it be but racial animus?"[144] Judge Joyner found this argument insufficient and explained the couple "need[ed] to establish some ***other*** evidence, apart from the mere different treatment," to defeat summary judgment.[145] We agree with Judge Joyner. The Township adduced evidence of its longstanding interest in the Property and Mr. Hendrick identifies no contradictory evidence showing the Township in fact acted out of racial bias. We again note the absence of any emergency or definitive plans for the Property—even if it arguably provides a basis for Mr. Hendrick to challenge the taking under Pennsylvania's Eminent Domain Code—does not, without more, establish racial animus violating his constitutional rights. He does not meet his

burden to affirmatively show the absence of a genuine issue of material fact. We grant summary judgment in favor of the Township on Mr. Hendrick's equal protection claim.

### D. We decline to exercise our supplemental jurisdiction over Mr. Hendrick's state law claims.

We need not reach the merits of Mr. Hendrick's related state law claims of abuse of process and tortious interference. Following our dismissal of his constitutional claims we lack subject matter jurisdiction over his state law claims unless we exercise our discretion to retain supplemental jurisdiction.[146] We decline to exercise our supplemental jurisdiction over Mr. Hendrick's state law claims and dismiss without prejudice to timely pursue merited claims in state court.

## III.    Conclusion

Mr. Hendrick cannot demonstrate a question of material fact suggesting the Township violated his substantive due process or equal protection rights. The Township is entitled to judgment as a matter of law on its civil rights claims. We decline to exercise supplemental jurisdiction over the state law claims.

---

[1] We write today to further detail the basis for yesterday's Order granting Defendants' Motion for summary judgment (ECF 30).

[2] ECF 22 ¶¶ 20, 21.

[3] *Id.* ¶¶ 12, 22.

[4] *Id.* ¶ 25.

[5] *Id.* ¶¶ 24–25.

[6] *Id.* ¶ 23.

[7] *Id.* ¶¶ 27–28.

[8] *Id.* ¶¶ 30–33.

[9] *Id.* ¶¶ 36–37.

[10] *Id.* ¶ 38.

[11] *Id.* ¶¶ 39–41.

[12] *Id.* ¶ 42; *see also* Hamaday Individual Dep. 25:11–27:2 (Defs.' Ex. 5). Defendants' Appendix and attached exhibits can be found at ECF 23. The entirety of ECF 23 is missing the ECF stamp so we refer to each of the exhibits by the numbers designated in Defendants' Appendix. Township Manager Hamaday's individual deposition is Exhibit 5.

[13] ECF 22 ¶ 44.

[14] *Id.* ¶ 45. The Township distributed a $10 million bond issue for open space, operating funds, equipment, projects, etc. in 2022. It appraised several properties and earmarked a group of funds for an "Open Space Plan." It included the amount of money needed to buy the Property in the funds sought by the bond issue. Hamaday Individual Dep. 23:22–25:10 (Defs.' Ex. 5).

[15] ECF 22 ¶¶ 2–3; Hendrick Dep. 14:15–15:7 (Defs.' Ex. 2).

[16] ECF 22 ¶ 4. Mr. Hendrick is also the owner of Billy Boy Real Estate, LLC. *Id.* ¶ 2.

[17] Hendrick Dep. 14:15–15:7 (Defs.' Ex. 2).

[18] ECF 22 ¶¶ 58, 67.

[19] *Id.* ¶¶ 67–71; *see also* Hendrick Dep. 15: 13–17, 18:21–19:1 (Defs.' Ex. 2). Mr. Hendrick estimates he spent about $250,000 on improvements to the Property. ECF 22 ¶ 68.

[20] ECF 22 ¶¶ 92–94.

[21] *Id.* ¶ 48–49.

[22] *Id.* ¶¶ 50, 52.

[23] *Id.* ¶ 52.

[24] *Id.* ¶ 54. Township Manager Hamaday swore he conducted an Internet search of "Billy Boy ***Trucking***." *Id.* (emphasis added). Billy Boy Trucking is not a party before us. We take judicial notice Billy Boy Trucking is not a registered company with the Pennsylvania Secretary of State. We assume, although it does not impact our analysis, Billy Boy Trucking is a fictitious name for one or both of Mr. Hendrick's companies.

[25] *Id.* ¶¶ 57, 61, 64.

[26] *Id.* ¶¶ 59, 87–88; *see also* Garzillo Dep. 52:11–23 (Defs.' Ex. 3).

[27] ECF 22 ¶¶ 53, 83. It is not entirely clear from the Township's undisputed material facts when Mr. Hendrick first spoke with Township Manager Hamaday; at paragraphs 49–53, the Township, citing Township Manager Hamaday's deposition, avers Township Manager Hamaday asked Mr. Damiani to have Mr. Hendrick call him in August 2022. But at paragraph 83 the Township states Mr. Hendrick spoke with Township Manager Hamaday in 2023. Mr. Hendrick likewise swore it was 2023 when Mr. Damini told him to call Township Manager Hamaday. Hendrick Dep. 29:2–6 (Defs.' Ex. 2).

[28] Hendrick Dep. 18:12–16 (Defs.' Ex. 2) (swearing he occupied the Property for "about three to four months" at the end of 2022).

[29] *Id.* 18:12–19:1.

[30] ECF 22 ¶ 72.

[31] *Id.* ¶¶ 73–74.

[32] *Id.* ¶ 76.

[33] *Id.* ¶ 75.

[34] *Id.* ¶¶ 78–81.

[35] *Id.* ¶ 98; *see also* Hamaday Individual Dep. 36:19–24 (Defs.' Ex. 5).

[36] ECF 22 ¶ 158.

[37] *Id.* ¶ 159.

[38] *Id.* ¶ 162.

[39] *Id.* ¶¶ 163, 166.

[40] *Id.* ¶ 165.

[41] *Id.* ¶ 105.

[42] *Id.* ¶¶ 100–02; ECF 27-2 ¶¶ 100–02.

[43] *Id.* ¶ 103.

[44] *Id.* ¶ 104.

[45] *Id.* ¶¶ 112–13.

[46] *Id.* ¶¶ 106–07.

[47] *Id.* ¶ 114.

[48] *Id.* ¶ 90; ECF 27-2 ¶ 188.

[49] ECF 22 ¶ 119.

[50] *Id.* ¶ 120.

[51] *Id.* ¶ 121.

[52] *Id.* ¶ 122.

[53] *Id.* ¶ 123.

[54] *See* Prelim. Objs. ¶ 3(g) (Defs.' Ex. 18).

[55] ECF 22 ¶¶ 124–25.

[56] *Id.* ¶ 126.

[57] *Id.*

[58] *Id.* ¶ 127.

[59] *Id.* ¶¶ 128, 130.

[60] *Id.* ¶ 129.

[61] *Id.* ¶ 132.

[62] *Id.* ¶ 133. Judge Tolliver appointed a new board of viewers later the same month upon recusal of the first board. *Id.* ¶ 134; *see also* November 26, 2024 Order (Defs.' Ex. 23).

[63] ECF 22 ¶ 135.

[64] *Id.* ¶ 136.

[65] *Id.* ¶¶ 137–38.

[66] *See* February 4, 2025 Stipulation (Defs.' Ex. 25).

[67] ECF 22 ¶¶ 141–42.

[68] *Id.* ¶ 143.

[69] *Id.* ¶ 144.

[70] *Id.* ¶ 146–47.

[71] *Id.* ¶¶ 14–50.

[72] ECF 1. Mr. Hendrick filed an amended Complaint on October 23, 2024. ECF 3.

[73] ECF 3.

[74] *See id.*

[75] ECF 24. Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533–34 (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

[76] ECF 27.

[77] ECF 24 at 11–12. The Township only argues *Rooker-Feldman* with respect to Mr. Hendrick's substantive due process claim.

[78] *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010) (alterations in original) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

[79] *Id.* at 169 (quoting *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003)).

---

[80] *Id.* (quoting *Noel*, 341 F.3d at 1164).

[81] *Exxon Mobil*, 544 U.S. at 293 (alterations in original) (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

[82] *See Great W. Mining*, 615 F.3d at 170 (alteration in original) ("As a final step, should the *Rooker–Feldman* doctrine not apply such that the district court has jurisdiction, '[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law.'" (quoting *Exxon Mobil*, 544 U.S. at 293)).

We acknowledge the Township's reliance on our analysis of *Rooker-Feldman* in a land use dispute in *Brandywine Vill. Assocs. v. E. Brandywine Twp.*, No. 20-2225, 2020 WL 5517353 (E.D. Pa. Sept. 14, 2020). But we are also mindful the *Rooker-Feldman* doctrine only applies in "limited circumstances." *Exxon Mobil*, 544 U.S. at 291. We have not seen, and the Township has not shown, authority disposing of this type of a challenge to a local government decision based on *Rooker-Feldman*. We remind the Township our *Rooker-Feldman* analysis in *Brandywine* was largely dicta as we based our decision on finding the landowner did not state a claim. We also today clarify, to the extent we created confusion by the unfortunate overbroad references in our *Brandywine* analysis, the *Rooker-Feldman* doctrine does not generally apply to challenge the local government's zoning decision; it instead applies when the landowner asks a federal judge to review and reject a state court judgment which caused the claimed harm. *See, e.g.*, *King v. Burr*, 728 F. App'x 83, 85–86 (3d Cir. 2018) (finding *Rooker-Feldman* barred plaintiff's claims where pleaded injury was caused by allegedly void state court orders). We note the dearth of authority barring a claim under *Rooker-Feldman* in this context since the landowner is generally challenging the local government's zoning or condemnation decision and not the state court's later judgment evaluating the underlying decision.

[83] The Township does not raise issue preclusion in its Motion for summary judgment but it did plead it as an affirmative defense. ECF 8 at 5 ¶ 2.

[84] *Kelly-Pimentel v. Pa. Dep't of Corrs.*, No. 15-1463, 2017 WL 1355175, at *4 (W.D. Pa. Apr. 13, 2017) (first quoting *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993); then citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980)).

[85] *Adelphia Gateway, LLC v. Pa. Env't Hearing Bd.*, 62 F.4th 819, 826 (3d Cir. 2023) (quoting *Rue v. K-Mart Corp.*, 713 A.2d 82, 84 (Pa. 1998)).

[86] *Hoover v. Parekh*, No. 18-02305, 2019 WL 7597205, at *4 (M.D. Pa. Nov. 6, 2019) (citing *King v. Mansfield Univ. of Pa.*, No. 15-00159, 2016 WL 6525177, at *4 (M.D. Pa. Nov. 3, 2016)), *report and recommendation adopted*, No. 18-2305, 2020 WL 247174 (M.D. Pa. Jan. 15, 2020).

[87] *See* Prelim. Objs. ¶ 3(g) (Defs.' Ex. 18).

[88] September 17, 2024 Memorandum (Defs.' Ex. 21) at 678a–679a (using the pagination assigned by Defendants).

[89] *Id.* at 679a. In his response to the Defendants' assertion of the *Rooker-Feldman* doctrine, Mr. Hendrick argues we have evidence that Judge Tolliver did not have at the time of the hearing. ECF 27-3 at 5 n.2. He does not explain why he did not adduce this evidence in state court.

[90] September 17, 2024 Memorandum (Defs.' Ex. 21) at 678a.

[91] *See* Prelim. Objs. ¶ 3(g) (Defs.' Ex. 18).

[92] ECF 3. Mr. Hendrick's tortious interference claim does not explicitly mention race. *Id.* ¶¶ 56–58. But he can only succeed on this claim if the Township had no factual or legal justification to interfere with Mr. Hendrick's contractual relationship with Mr. Damiani, which, based on the pleadings, implicitly requires a finding of racial animus.

[93] *See* September 17, 2024 Memorandum (Defs.' Ex. 21) at 673a.

[94] *Lean v. A. City Showboat Inc.*, No. 07-0407, 2007 WL 1545288, at *2 (E.D. Pa. May 25, 2007) (alteration in original) (quoting *Karibjanian v. Chromalloy Pharm., Inc.*, No. 90–4641, 1991 WL 125176, at *1 (E.D. Pa. June 28, 1991)).

[95] Pa. R.A.P. 311(e). In this regard, Judge Tolliver's order and memorandum are different from orders overruling preliminary objections in other cases, which are generally "interlocutory and unappealable." *Lean*, 2007 WL 1545288, at *2 (quoting *Chase Manhattan Mortg. Corp. v. Hodes*, 784 A.2d 144, 145 (Pa. Super. Ct. 2001)).

[96] *Lean*, 2007 WL 1545288, at *2 (alterations in original) (quoting *Karibjanian*, 1991 WL 125176, at *1).

[97] The Township also moved for summary judgment on an unpleaded procedural due process claim, *see* ECF 24-1 at 3 n.1, but Mr. Hendrick clarified he is not suing the Township under a procedural due process theory. ECF 27-3 at 2 n.1.

[98] ECF 24-1 at 8–11.

[99] ECF 27-3 at 8–9.

[100] *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400–02 (3d Cir. 2003)).

[101] *United Artists*, 316 F.3d at 400 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

[102] *Chainey*, 523 F.3d at 220 (citing *United Artists*, 316 F.3d at 400).

[103] *Toll Bros. v. Twp. of Moorestown*, No. 10-4843, 2011 WL 2559507, at *8 (D.N.J. June 27, 2011) (citing *United Artists*, 316 F.3d at 402).

[104] *Id.* (citing *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 286 (3d Cir. 2004)).

[105] ECF 24 at 9.

[106] Hendrick Dep. 46:12–47:1 (Defs.' Ex. 2).

[107] *Id.* 47:10–13.

[108] ECF 24-1 at 9–10. The Township also points to its continued monitoring of land transfer reports to determine if the sale went through as evidence that refutes any notion of racial bias. *Id.* at 10–11. We find this evidence carries less weight as this monitoring took place after the Township learned Mr. Damiani had agreed to sell the Property to a minority-owned business and because it is not entirely clear when the Board learned Mr. Hendrick is Black.

[109] ECF 27-3 at 9.

[110] *Id.*

[111] *Id.*

[112] *Surgick v. Cirella*, 509 F. App'x 119, 123 (3d Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

[113] 2012 WL 610333 *10–*11 (M.D. Pa. Feb. 24, 2012). He also cites *Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633 (E.D. Pa. 2003), *see* ECF 27-3 at 8. Judge Baylson in *Associates in Obstetrics & Gynecology* found the plaintiffs pleaded the Township selectively enforced zoning regulations against an abortion provider with the intent of eliminating abortion services. *Id.* at 658. We find this case inapplicable.

[114] ECF 27-3 at 8.

[115] *Andrews*, 2012 WL 610333, at *1.

[116] *Id.* at *3.

[117] *Id.* at *8.

[118] *Id.*

[119] *Id.* at *9.

[120] *Id.* at *11.

[121] *Id.*

[122] *See Eichenlaub*, 385 F.3d at 286.

[123] ECF 24-1 at 13–14.

[124] ECF 27-3 at 5.

[125] *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)).

[126] *RP Wynstone, LP v. New Hanover Twp.*, No. 24-959, 2025 WL 418513, at *18 (E.D. Pa. Feb. 5, 2025) (alterations in original) (quoting *Dique v. N.J. State Police*, 603 F.3d 181, 184 (3d Cir. 2010)).

The Township also cites the standard for a class of one equal protection claim, but we find its reliance inapposite, as Mr. Hendrick, a Black man, is a member of a protected class—a fact the Township does not dispute. ECF 24-1 at 13 ("Here, undeniably, Plaintiffs are a protected class."). The class of one theory applies when "the plaintiff did ***not*** allege membership in a class or group." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 120 (2000) (emphasis added); *see also, e.g.*, *Perez v. Lebron*, No. 20-04331, 2021 WL 2255852, at *1 n.2 (E.D. Pa. June 3, 2021) ("Perez, a Hispanic male, is a member of a protected class, so we need not examine his claims under the 'class of one' rubric.").

[127] *RP Wynstone*, 2025 WL 418513, at *18 (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)), *aff'd*, 726 F. App'x 118 (3d Cir. 2018).

[128] *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d 670 (E.D. Pa. 2017) (quoting *Jeffers v. City of Washington*, No. 14-1361, 2015 WL 4232662, at *3 (W.D. Pa. July 13, 2015)), *aff'd*, 726 F. App'x 118 (3d Cir. 2018*)*. The plaintiff in *Giuliani* proceeded under a class of one equal protection theory, which requires "an extremely high degree of similarity . . . ." *Jeffers*, 2015 WL 4232662, at *3 (quoting *Curbside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Still, we find this standard instructive in comparing the relevant properties in this case.

[129] ECF 24-1 at 14; Hamaday Individual Dep. 75:23–77:19 (Ex. 5).

[130] ECF 24-1 at 14.

[131] *Id.*; ECF 27-2 ¶ 165.

[132] ECF 24-1 at 14. The Township further argues Mr. Damiani is not in a protected class and the taking was against Mr. Damiani, not Mr. Hendrick. *Id.* at 15. We need not address this argument. We assume for the sake of deciding this claim the taking also impacted Mr. Hendrick, the equitable owner of the property.

[133] ECF 27-3 at 5–6.

[134] *Id.* at 5.

[135] *Id.* at 6.

[136] For instance, the Township claims the other three properties it considered acquiring for open space "are not similar to the Property for a variety of reasons[,]" but does not really express why this is so apart from indicating one is owned by a railroad and one is valued at $4 million. ECF 24-1 at 14. The Township does not cite authority to support that identity of ownership and price can indicate dissimilarities between properties. The Township claims the property it is in the process of acquiring, the Rossi Property, is "not alike in all relevant aspects[]" because it is being acquired for roadway access versus open space. This is slightly more persuasive than the conclusory arguments with respect to the other three properties, but still, the Township does not provide authority to support the intended uses for properties can indicate dissimilarities.

[137] *Cf. Andrews*, 2012 WL 610333, at *8 (denying summary judgment on equal protection claim where Harrisburg government agencies issued condemnation orders against the properties of plaintiff and other minority property owners but did not prosecute properties of non-minority property owners for ten or more years).

[138] We do not necessarily think the treatment of the Rossi Property was more favorable because the Township considered condemning the Rossi Property but instead the parties were able to reach an agreement of sale, which may have been the case for Mr. Hendrick, too, if he had expressed his interest in selling the Property. Mr. Hendrick instead swore when Mr. Hamaday asked if he wanted to sell the Property, he responded, "no but, you know, maybe when I'm done with it we could talk about it then." Hendrick Dep. 29:20–30:1 (Ex. 2).

[139] *Homan v. City of Reading*, 15 F. Supp. 2d 696, 703 (E.D. Pa. 1998) (alteration in original) (first quoting *Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 984 (E.D. Pa. 1997); then citing *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995); and then citing *LaTrieste Restaurant and Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)). In *Homan*, Judge Joyner granted summary judgment on the plaintiffs' equal protection claim, which arose when the City declared their warehouse a public nuisance. 15 F. Supp. 2d at 697, 702–04. The plaintiffs' argument hinged on the fact they were an interracial couple and the City gave Caucasian property owners more time to clear their properties and/or did not act to demolish them. *Id.* at 703. Judge Joyner found "there [was] no evidence from which a rational juror could find that the Defendant had an improper racial motivation to selectively enforce the law concerning abatement of public nuisances." *Id.* at 704.

[140] 758 F. App'x 258 (3d Cir. 2018).

[141] *Id.* at 262–63.

[142] *Id.* at 263.

[143] ECF 27-4 at 5–6.

[144] *Homan*, 15 F.Supp.2d at 703 (cleaned up).

[145] *Id.* at 704 (emphasis added).

[146] We may consider our supplemental jurisdiction *sua sponte*. *See Patel v. Meridian Health Sys., Inc.*, 666 F. App'x 133, 136 (3d Cir. 2016). Congress allows us to exercise supplemental jurisdiction over state law claims where the state law claims "form part of the same case or controversy under Article III[.]" 28 U.S.C. § 1367(a). Congress also empowers us to decline exercising supplemental jurisdiction over state law claims if we dismissed "all claims over which [we] ha[ve] original jurisdiction[.]" *Id.* § 1367(c)(3); *cf. Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 43–44 (2025) (we must remand state law claims before us under section 1367 supplemental jurisdiction based on federal question where all federal claims are dismissed from the case). *See also Moore v. Atlantic County*, No. 07-5444, 2015 WL 1268184, at *9 (D.N.J. Mar. 18, 2015) ("It is generally established in the Third Circuit that a court may decline supplemental jurisdiction when federal claims are dismissed by way of summary judgment." (first citing *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976); then citing *Simmerman v. Corino*, 804 F. Supp. 644, 658 (D.N.J.1992))).